IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BLAKE MIRACLE, | CV 22-52-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER DENYING IN PART AND GRANTING IN PART SUMMARY JUDGMENT |
| SIGNAL PEAK ENERGY, LLC, | |
| Defendant. | |

Plaintiff Blake Miracle filed this action against Signal Peak Energy, LLC ("Signal"), alleging wrongful discharge under Montana's Wrongful Discharge from Employment Act ("WDEA"). (Doc. 4). He also seeks punitive damages. (*Id.* at 5–6). Signal moved for summary judgment in July 2022, which the Court denied as premature because the record was underdeveloped. (Docs. 10, 23). Signal now moves again for summary judgment on Miracle's wrongful discharge and punitive damages claims. (Doc. 33).

The Court denies summary judgment on Miracle's wrongful discharge claim because whether Miracle violated Signal's conflict of interest policies, giving Signal good cause to fire Miracle, is genuinely disputed. As to the punitive damages claim, summary judgment is proper because Miracle admits that this claim is unsubstantiated. Accordingly, the Court denies Signal's motion as to Miracle's wrongful discharge claim and grants it as to Miracle's punitive damages claim.

1

## I.      Relevant Background

Signal operates a mine in Musselshell County, Montana. (Doc. 4 at 2). Signal hired Miracle on July 11, 2011. (Doc. 7 at 2). Miracle was promoted to Waste Disposal Area ("WDA") Supervisor in February 2019. (Doc. 39 at 2). The parties dispute Miracle's responsibilities in this role and did not provide the job description for the WDA Supervisor position, as they had in similar wrongful discharge cases in front of this Court. *See, e.g., Brown v. Signal Peak Energy, LLC*, CV 20-180-BLG, 2023 WL 3742358, at *1 (D. Mont. May 31, 2023). Their dispute over the specifics of Miracle's job responsibilities forms the basis of the issues in this motion and will be discussed at length below.

At some point when Miracle was the WDA Supervisor, he had a conversation with Vedat Ozsever, the then-Vice President of Surface Operations at Signal, and Cecil Lockhart, who owned Lockhart Trucking, LLC. (Doc. 39 at 6). The parties dispute whether, at the time of the conversation, Lockhart had already formed Lockhart Trucking or was in the process of forming it. (*See id.*). Lockhart was discussing his trucking business with Ozsever and Miracle and indicated that he needed money for the business. (*Id.*). Miracle recounted that Ozsever recommended Lockhart borrow the money from a bank, someone who he knew, or Miracle. (*Id.*). Miracle eventually agreed to loan the money, though the record is not clear whether Miracle agreed to do so during that conversation or during a phone call at another

2

time. (*Id.*; Doc. 35-1 at 18). Miracle claims he "had the express approval to loan this money to [Lockhart] by way of Ozsever" and "made no secret of the fact that [he] had loaned this money to" Lockhart. (Doc. 39 at 6). Signal does not dispute Miracle's account of the initial conversation with Ozsever but disputes that Ozsever or Signal ever gave approval for the loan. (Doc. 42 at 8).

The parties also dispute the purpose of loan. Signal asserts that the loan was to help Lockhart start his own trucking company and submit a bid to Signal to obtain certain work in the WDA, while Miracle maintains that the loan was for Lockhart Trucking to pay its insurance premiums. (*See* Doc. 39 at 5–6). Miracle testified in a deposition that Ozsever suggested Lockhart start his own company during their conversation. (Doc. 35-1 at 18).

Miracle withdrew $40,000 from his company retirement account and either placed it in a savings account or transferred it to his wife. (Doc. 39 at 7). On September 23, 2020, either Miracle or his wife advanced $9,000 to Lockhart pursuant to Miracle's agreement to loan Lockhart money. (*Id.* at 10). Miracle remembers Lockhart indicating that he intended to use the money to pay for insurance premiums. (Doc. 38-2 at 5). Lockhart received another $9,000 pursuant to the agreement on October 1, 2020, and October 14, 2020, for a total of $27,000. (Doc. 35-1 at 10). The record does not indicate Lockhart told Miracle for what he was using the second and third payments.

Around this time, though exactly when is not clear, Lockhart Trucking submitted a bid to Signal to perform certain work in the WDA. (Doc. 39 at 5, 8, 9). Signal granted the contract to Lockhart Trucking. (*Id.* at 9). The parties dispute the extent of Miracle's involvement in the bid review and selection process.

On December 13, 2021, Signal's President and CEO Joseph Farinelli, Vice-President of Underground Operations Parker Phipps, and Human Resources Director Philip Stansell called Miracle into a meeting and, at some point, asked Miracle whether he had loaned Lockhart money. (*Id.* at 14). Miracle admitted that he loaned Lockhart the $27,000, though he maintains in briefing that Miracle's wife advanced the funds. (*Id.* at 11, 15). Miracle later testified in his affidavit that he never had "any reason to believe that anyone at Signal" would object to him loaning Lockhart the money, interest-free. (Doc. 38-2 at 6).

Farinelli told Miracle he could either quit or resign. (Doc. 39 at 15). For the purposes of this motion, Signal indicated it would assume Miracle was discharged and did not resign.[1]

Miracle sued Signal for wrongful discharge and punitive damages in Montana's Fourteenth Judicial District Court in Musselshell County on March 28,

---

[1] In Signal's first motion for summary judgment, a genuine dispute existed as to whether Miracle resigned or was actually or constructively discharged. (Doc. 23 at 5–10). Though Signal stated it will assume for the purposes of the instant motion that Miracle was discharged, Miracle maintains that the dispute still exists, even with Signal's concession, and precludes summary judgment. (Doc. 38 at 14).

4

2022. (Doc. 1-2). Signal removed the case to this Court on May 26, 2022. (Doc. 1). Signal then moved for summary judgment on July 1, 2022, which the Court denied without prejudice because the record was not developed enough for it to decide the motion. (Doc. 23). Signal filed the instant motion for summary judgment on November 13, 2023. (Doc. 33).

## II.   Legal Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it could affect the outcome of the suit under the governing law. *Id.*

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. To meet this burden, the movant must identify those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine

issue as to any material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 130, 150 (2000). The Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

## III.   Analysis

The WDEA provides the exclusive remedy for wrongful discharge from employment in Montana. Mont. Code Ann. § 39-2-902. A discharge is wrongful if it is: (1) in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy; (2) not for good cause after the employee's probationary period; or (3) the result of the employer violating its own written personnel policy. *Id.* § 39-2-904(1). Miracle alleges his discharge was wrongful under (2) and (3).

In considering whether a discharge was wrongful, "[a]n employer's legitimate right to exercise discretion over whom it will employ must be balanced … against the employee's equally legitimate right to secure employment." *Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (internal citation omitted). "The balance should favor an employee who presents evidence, and not mere speculation or

denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business." *Id.* (internal citation omitted).

Employers are afforded the "greatest discretion" when determining whether to terminate a managerial employee or an employee who occupies a "sensitive" managerial position and exercises "broad discretion." *Sullivan v. Cont'l Constr. of Mont., LLC*, 299 P.3d 832, 835 (Mont. 2013); *McConkey v. Flathead Elec. Co-op.*, 125 P.3d 1121, 1126 (Mont. 2005). The Montana Supreme Court granted employers such discretion to prevent courts from "becom[ing] involved in the day-to-day employment decisions of a business regarding its management." *McConkey*, 125 P.3d at 1126.

Signal asserts it had good cause to fire Miracle because Miracle violated the company's Conflict of Interest policy in its Employee Handbook ("Conflict Policy") and its Code of Business Conduct and Ethics ("Ethics Code") when he loaned Lockhart $27,000 so Lockhart supposedly could start a company to solicit and submit a bid to perform work for Signal in the WDA. (Doc. 37 at 11–12). Miracle's actions made Signal "los[e] confidence in Miracle's judgment, honesty, and integrity." (*Id.* at 12 (citing Doc. 36 at 5)). Signal further contends that "the problem" with Miracle's loan "was compounded by the fact that Miracle had direct supervisory control, including approval of invoices, over a contractor that owed him

7

a substantial amount of money." (*Id.*).  For the same reasons, Signal argues Miracle was a supervisory employee over whom it had broad discretion to terminate.  (*Id.* at 10).  Last, Signal argues that it did not violate any of its written personnel policies in discharging Miracle because its discipline policy leaves the type of disciple imposed to the discretion of the company on a case-by-case basis.  (*Id.* at 21–22 (citing Doc. 20-1 at 126–27)).

Miracle does not dispute that he made the loan to Lockhart.  Rather, he contends the loan was not a conflict of interest, and thus did not provide good cause for his termination, because Miracle did not have the type of decision-making power and influence over Lockhart Trucking that Signal avers.  (Doc. 38 at 2–11, 15).  Further, Miracle asserts Signal should not be afforded broad discretion to terminate him because Miracle was not a manager and did not hold a sensitive managerial position with broad decision-making discretion, akin to those plaintiffs in the cases cited by Signal.  (*Id.* at 16–18).  Miracle also asserts that even if Signal can show good cause, its reason for terminating him was pretextual.  (*Id.* at 19–20).  Last, Miracle argues Signal violated its personnel policies by failing to utilize progressive discipline for addressing Miracle's alleged conflict of interest.  (*Id.* at 20–21).

A.   *Good Cause*

The WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on failure to satisfactorily perform job duties, disruption of the

employer's operation, or other legitimate business reasons[.]" *Id.* § 39-2-903(5). A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious," and has "some logical relationship to the needs of the business." *Becker v. Rosebud Operating Servs., Inc.*, 191 P.3d 435, 441 (Mont. 2008) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993)). Violation of company policies can constitute good cause. *See Fenger v. Flathead County*, 922 P.2d 1183, 1185–86 (Mont. 1996); *Golden v. Nw. Corp.*, 13 F. Supp. 3d 1052, 1057–59 (D. Mont. 2014).

An employee has the burden of proving their discharge was wrongful. *Becker*, 191 P.3d at 441. However, when the employer moves for summary judgment on a WDEA claim, it has the initial burden to establish that no issues of material fact as to good cause exist. *Smith v. Charter Comm'cns, Inc.*, CV 18-69-BLG, 2021 WL 236660, at *1 (D. Mont Jan. 25, 2021), *reversed and remanded on other grounds*, No. 21-35149, 2023 WL 4703251 (9th Cir. July 24, 2023). If an employer establishes good cause, the employee may only defeat summary judgment if they can "prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest reason for the discharge.'" *Becker*, 191 P.3d at 441 (quoting *Johnson*, 152 P.3d at 734). The employee's evidence "must go beyond mere denial or speculation and show facts sufficient to

allow a fact-finder to decide that the termination was not for good cause." *Charter Commc'ns*, 2021 WL 236660, at \*2.

Signal does not invoke a specific portion of either the Conflict Policy or its Ethics Code but rather cites both in their entirety with emphases on particular sections. Signal's Policy, with the emphases from Signal, states:

> ***Signal Peak, its directors, officers, employees, consultants and independent contractors, must act in compliance with appropriate standards of ethics, loyalty, honesty, integrity, and fair dealing. A conflict of interest arises when a Signal Peak employee*** or agent fails to maintain objectivity in making business decisions and, as a result, the employee or agent's private interests interfere with Signal Peak's interests, ***such as when an employee or agent (or family member) benefits financially from a decision made on behalf of Signal Peak.*** Employees and agents should not permit outside interests to interfere with their job duties and are prohibited from using their position or relationship with Signal Peak for private gain or to obtain benefits for themselves or family members. ***Employees and agents must fully disclose to the Human Resources Director any relationship or activity that might impair, or appear to impair, their ability to make objective decisions when performing their jobs or fulfilling their roles.***

> For illustrative purposes, ***a conflict of interest could arise where an employee,*** a family member, ***or good friend has an interest in a contract being considered or worked on by Signal Peak, or where the employee is in a position to influence a business decision that may result in a personal gain for the employee*** or the employee's family member as a result of Signal Peak's business dealings.

> Although it is not possible to specify every action that might create a conflict of interest, this policy sets forth the ones that most frequently present problems. ***If questions arise as to whether an action or proposed course of conduct would create a conflict of interest, employees should immediately contact Human Resources to obtain advice on the issue.***

(Doc. 41 at 4–5; Doc. 20-1 at 123).

The Ethics Code, with emphases from Signal, reads:

> ***Company officers and employees have an obligation to*** the Company and its investors to always act in the best interest of the Company and ***avoid activities that might make it difficult to perform Company work objectively and effectively. Officers and employees must avoid any involvement with outside interests*** where there exists the possibility of personal advantage that may be to the detriment of the Company, or ***where a person's private interest interferes in any way – or even appears to interfere – with the interests of the Company as a whole.***

> It is impractical to foresee or define every situation which might give rise to a conflict of interest. Generally, ***a conflict of interest exists when an obligation or a situation resulting from a person's personal activities or financial affairs may adversely influence that person's judgment in the performance of job-related duties*** or may prevent the person from devoting the necessary time and effort to Company responsibilities. Some types of Company transactions that could adversely affect the Company's interest are purchasing of equipment, supplies or services; awarding construction or other contracts; and the purchase, sale or lease of properties. A conflict of interest can also arise where an employee, a member of his or her family or a person with whom he or she shares a close personal relationship, receives an improper personal benefit as a result of the employee's position in the Company.

> ***No covered person who is in a position to make or influence a decision regarding a business transaction between the Company and a third party should give to*** or accept from that party (or permit a family member to give or accept) ***anything of substantial value.*** This includes accepting any items, goods, services, loans, preferred investment opportunities, travel, employment or things of value if likely offered in the expectation of influencing the recipient's judgment. These rules do not prevent accepting customary, inexpensive noncash gifts, or attendance with prior approval of your supervisor at functions sponsored for a number of industry participants not exclusive to the Company, so long as the gift or attendance cannot be construed as a payoff and does not violate applicable law. ***Any covered person***

11

*requested to make or accept a gift or payment that is prohibited or may be prohibited under the Code of Ethics, should immediately report the request and all related information to his or her supervisor.*

Company management recognizes that situations may exist where potential conflicts of interest are difficult to avoid, especially at remote mine locations. When a potential or actual conflict of interest exists, it does not necessarily mean that there has been any employee wrongdoing. It does mean that *Company policies regarding conflicts of interest must be followed. These include before the fact written disclosure by employees to the Company's Controller of any actual or potential conflicts of interest, including ambiguous situations*. Such disclosures will enable the Company to review the circumstances and determine if they are acceptable, or if a change in business practices or procedures is necessary. *Any covered person in doubt about a particular case should make a timely written disclosure of the facts to the Company's Controller*. The Company's Controller will provide a written response to all such disclosures.

(Doc. 41 at 5–7; Doc. 35-1 at 69–70).

Since the two policies provide various definitions of conflicts of interest and various procedures in the event a conflict arises, the Court will distill the common issues the Conflict Policy and Ethics Code present to help structure its analysis. From the emphasized portions of the Conflict Policy and the Ethics Code, the Court can glean ten issues Signal seems to highlight:

1. Did Miracle benefit from a decision made on behalf of Signal?
2. Did the loan impair or appear to impair Miracle's ability to make objective decisions when performing his job?
3. Does Miracle have a personal interest in Lockhart Trucking's contract with Signal?
4. Was Miracle in a position to influence a business decision that may result in a personal gain for Miracle as a result of Signal's business dealings?
5. Does Miracle's interest in the loan interfere with the interests of Signal?

12

6. Did the loan adversely influence Miracle's judgment in the performance of his job?
7. Was Miracle in a position to make or influence a decision regarding a business transaction between Signal and Lockhart Trucking?
8. Did Miracle tell his supervisor that Lockhart had requested the loan?
9. Did Miracle "fully disclose" to the Human Resources Director that he had made the loan?
10. Did Miracle make a before-the-fact written disclosure to the Company Controller about the actual or potential conflict of interest stemming from the loan?

These ten questions fall into four categories:

1. Did Miracle have an interest in a decision made by Signal?
2. Was Miracle in a position to make or influence that decision or related ones?
3. Did Miracle's interest interfere or appear to interfere with his ability to objectively make decisions or more generally with his ability to perform his job on behalf of Signal?
4. Did Miracle properly disclose the loan?

The Court will address each question in turn.

*1. Interest in a Decision Made by Signal*

First, it is undisputed from the record that Miracle had an interest in certain decisions made by Signal: If Lockhart Trucking received the contract from Signal, Lockhart Trucking could begin to pay back the money it owed Miracle. Additionally, if Lockhart Trucking's invoices were approved, Lockhart Trucking would receive money that it could use to pay Miracle the money it owed him.

Miracle emphasizes that he did not financially benefit from the loan because it was interest-free. (Doc. 38 at 9–10). However, Miracle does not need to financially benefit, *i.e.* make money, from the loan to have an interest in Signal

paying Lockhart Trucking.  Miracle simply can have an interest in having the loan repaid and having it repaid faster than not.

### 2. *Position to Make or Influence a Decision*

Second, key factual disputes exist as to whether Miracle was in a position to make or influence a decision made by Signal in which Miracle had an interest because of the loan.  These disputes stem from the lack of clarity in the record on Miracle's job responsibilities and whether he had broad discretion to make management-level decisions, versus narrow discretion to make discrete decisions about the type of work people were required to perform in specific situations.  The Court's inability to resolve the factual disputes concerning Miracle's job responsibilities also prevent the Court from determining whether Miracle held a managerial position, such that Signal had the broadest discretion to terminate him.

Signal and Miracle dispute three key components of Miracle's job: whether and to what extent Miracle (1) was involved in the process of selecting bids from contractors, including Lockhart Trucking, (2) approved timecards and invoices for contractors, including Lockhart Trucking, and (3) directed the day-to-day operations of contractors, including Lockhart Trucking.  The Court will address each in turn.

### a. Bid Process for Work in the WDA

The parties dispute whether and to what degree Miracle was involved in the process of selecting Lockhart Trucking to perform work in the WDA.

Signal asserts that it is "uncontroverted that Miracle was involved in the process of interviewing the companies that submitted bids for [the work to be performed in the WDA], including Lockhart Trucking." (Doc. 34 at 11 (citing Doc. 41 at 3; Doc. 36 at 4)). On reply, Signal also notes Miracle "testified during deposition that he was involved in the bid processes and selection of bidders for Signal Peak, including in the Lockhart Trucking bid." (Doc. 42 at 7).

Miracle maintains he "was not involved in the bid process … and had no input into who was selected to perform work at Signal Peak." (Doc. 38 at 4). Miracle cites to Ozsever's testimony, in which Ozsever states that "Miracle did not make the decision of who was chosen from the 'bid pool' to fulfill the services required of Signal Peak." (*Id*. (quoting Doc. 39 at 19–20)). Ozsever went on to say that he and Farinelli "solely made" that decision and that, with respect to Lockhart Trucking, they did so because the company had the most reasonable rates, would be most suited to work with Signal, had performed work for Signal previously, and had employees whom Signal knew. (*Id*. (quoting Doc. 39 at 6–8, 19–20)).

The record demonstrates that Miracle, by his own admission, "was a part of the interviewing process" for the work for which Lockhart Trucking bid. (Doc. 35-1 at 19). In his affidavit, Miracle specified that he "took down notes of information to provide to Ozsever." (Doc. 38-2 at 7).

However, this fact is not dispositive because taking down notes during an interview does not necessarily equate to making or influencing the decision of to whom to award a bid. It could constitute influencing or making the bid decision if, for instance, Miracle's notes contained subjective assessments of the statements made. But it also could not if, for instance, Miracle's notes were verbatim recitations of the statements made. Further, Miracle's deposition and affidavit are consistent with each other and Ozsever's affidavit that Miracle was not involved in the decision to award Lockhart Trucking the work. (Doc. 35-1 at 19; Doc. 38-1 at 4; Doc. 38-2 at 7).

The Court is left with two accounts from people who were, to some degree, involved in the bid process (Miracle and Ozsever) who say Miracle had no influence over or input into the decision to award the bid to Lockhart Trucking, and one account from someone who was not involved in the bid process (Phipps) who says Miracle had "substantive input into the selection of the contractor." (Doc. 36 at 4). This dispute is sufficient to preclude summary judgment.

The Court also will address the parties' disagreement over the evidentiary value of each affidavit. As to Ozsever, Signal discredits Ozsever's affidavit on the ground that Ozsever was not disclosed as a witness by either party, not deposed by either party, and, since leaving Signal, has "frequently voiced to others his displeasure with Signal[.]" (Doc. 42 at 6). First, for the Court to discard an affidavit

16

from a witness not properly identified under Federal Rule of Civil Procedure 26,
Signal must ask the Court to do so. *See* Fed. R. Civ. P. 37(c)(1). Absent such a
motion and supporting evidence, the Court will consider Ozsever's affidavit.
Second, the fact that Ozsever was not deposed by either party is irrelevant. Signal
could have moved to reopen discovery on the grounds that Ozsever was not
disclosed previously and deposed him, if it felt it was necessary. Third, Signal
provided no evidence that Ozsever has criticized Signal, nor does that automatically
discredit him. Without any specific evidence undermining Ozsever's credibility, his
credibility in light of his supposed past criticism of the company is an issue for the
jury, not the Court.

As to Phipps's affidavit, the Court also refuses to disregard it. A declaration
is sufficient to create a genuine dispute of material fact even if uncorroborated and
self-serving if "based on personal knowledge, legally relevant, and internally
consistent." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 498 (9th Cir. 2015).
"[T]he district court may not disregard a piece of evidence at the summary judgment
stage solely based on its self-serving nature," unless it "states only conclusions and
not facts that would be admissible evidence." *Id.* at 497. Phipps's affidavit is
certainly self-serving, given he is the current CEO of Signal and presumably wants
to advance Signal's litigation interests. Additionally, much of his affidavit is mostly
uncorroborated since, other than the invoice approval emails, no other evidence

supports Phipps's affidavit. However, Phipps's affidavit is sufficient to create a genuine dispute of fact because his testimony is based on his personal knowledge, on legally relevant issues, and internally consistent. The fact that Phipps was not involved in the bid process, let alone working in Signal's Surface Operations division at that time, speaks to his credibility and the weight that should be given to his testimony. *Id.* at 497 ("the source of evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact."). At summary judgment, the Court cannot determine credibility or weigh the evidence. *Reeves*, 530 U.S. at 150.

Likewise, Miracle's affidavit is sufficient to raise disputes of fact. Though it is self-serving and uncorroborated with non-testimonial evidence, his statements are based on his personal knowledge, largely consistent with those made in his deposition, and often are corroborated by Ozsever. The Court will not rely on those that are inconsistent with his deposition or not corroborated by Ozsever.

Accordingly, the extent of Miracle's involvement and influence in the bidding process is disputed.

### b.    Contractor Timecards and Reimbursement

Second, the parties disagree on whether Miracle approved Lockhart Trucking's invoices or had influence over their approval.

Signal argues it is undisputed that Miracle approved the invoices. Signal points to Phipps's affidavit, in which he states that Miracle's job duties included approval of timecards and reimbursement of the contractors over whom he had supervisory authority. (Doc. 36 at 3). Signal also provided the Court with copies of two emails from Miracle to an employee in Signal's Accounts Payable division dated September 28, 2021, and November 21, 2021, saying, "Hey Laurel, [the invoice] is good to go," and "Hey Laurel, this [invoice] is approved," for invoices from Lockhart Trucking totaling $20,286.00 and $16,743.00, respectively. (Doc. 42-2). Ozsever and Byron Kinn—the vice presidents of surface operations at the time of each invoice—are included on the September 28 and November 21 emails, respectively. (*Id.*).

Miracle maintains he did not approve Lockhart Trucking's invoices. (Doc. 38 at 7). Miracle cites to his and Ozsever's affidavits, in which they state that Ozsever and Farinelli, not Miracle, were responsible for approving timecards and reimbursement for contractors, including Lockhart Trucking. (*Id.* at 3, 7; Doc. 38-1 at 6; Doc. 38-2 at 4).

Whether Miracle influenced or made the decision to approve Lockhart's Trucking expenses presents a dispute that precludes summary judgment. While Miracle and Ozsever assert that Ozsever and Farinelli approved Lockhart Trucking's expenses, Phipps maintains that Miracle had that responsibility. The two emails

19

from Miracle to Accounts Payable only further the dispute and present additional questions, notably whether Miracle decided that the invoices were reimbursable or was simply the messenger. Given his supervisor was copied on both emails, the latter is plausible.

Further, Miracle's deposition testimony is not inconsistent with his and Ozsever's affidavits: Miracle stated the contractors would provide their hours to the foreman, who would write the hours down and have the contractors initial the completed timesheets at the end of each week. (Doc. 35-1 at 14). Miracle's foreman would give him the timesheets on Monday morning, and Miracle would enter the hours into a spreadsheet. (*Id.* at 14–15). Miracle would then email the spreadsheets to the vice president of surface operations (either Ozsever or Kinn). (*Id.* at 15). "The vice president looked at it, gave me the okay, then he forwarded it to the account department [and] say, Hey, Laurel, this is approved." (*Id.*).

Miracle's official job description could provide the Court with a source of undisputed evidence of Miracle's responsibilities. Without it, the motion boils down to a game of he-said-he-said that a jury must decide.

c.     Authority to Direct Day-to-Day Work

Signal also contends that Miracle had "direct supervisory authority over Lockhart Trucking," and such authority contributed to his conflict of interest. (Doc. 37 at 11). Signal specifically argues Miracle had "the authority and responsibility

to direct Lockhart Trucking's work," to "ensure that it followed all required safety and environmental rules," and to retain, discipline, and/or terminate Lockhart Trucking.   (*Id.* at 10–11).   Signal cites to Phipps's affidavit in support of its arguments. (*Id.* (citing Doc. 36 at 2–4)).

Miracle disputes this based on his and Ozsever's sworn testimony. (Doc. 38 at 6–7).   Miracle quotes Ozsever's testimony that, as Vice President of Surface Operations, Ozsever "had direct supervisory authority over Lockhart Trucking, along with CEO Farinelli." (*Id.* (quoting Doc. 39 at 21)).   Ozsever continued, saying that Ozsever "was responsible for supervising Lockhart Trucking's day-to-day operations." (*Id.* at 6 (quoting Doc. 39 at 21)).   Miracle further notes Ozsever testified that Miracle was "not responsible for approving and/or disapproving the work performed by Lockhart Trucking.   [Ozsever] monitored and controlled Lockhart Trucking's operations, under the direction and approval of CEO Farinelli. If there was anything questionable about the work performed by Lockhart Trucking," Ozsever was responsible for addressing it, according to his testimony. (*Id.* at 6–7 (quoting Doc. 39 at 20)).

On reply, Signal points out that Miracle does not dispute that his job title was WDA *Supervisor*. (Doc. 42 at 7).   Additionally, Signal contends Miracle's affidavit denying supervisory duties contradicts his deposition testimony that he oversaw the

contractor crews including, at one time, Lockhart Trucking, on their day-to-day projects. (*Id.* at 4 (quoting Doc. 35-1 at 14)).

The Court finds that whether Miracle had the kind of managerial responsibilities that Signal alleges is disputed and precludes summary judgment on the issue. Like the issues the Court already has discussed, the competing evidence in the record is all testimony: While Phipps maintains Miracle supervised Lockhart Trucking and could discipline Lockhart Trucking employees on his crew, Miracle and Ozsever state that Ozsever and Farinelli held that role. Thus, the Court must determine whether the testimonial evidence contains material inconsistencies that undermines the parties' respective positions.

Contrary to Signal's argument, Miracle's deposition and affidavit testimony are consistent that the extent of his oversight of Lockhart Trucking was specific to the projects the Lockhart Trucking employees were tasked with completing. For instance, Miracle testified in his deposition that one of his responsibilities was to create daily work plans for the WDA crews, meaning he directed them where to dump their loads on what days depending on where they dumped the previous day(s). (*Id.* at 9). He also testified that he directed where his four to five Signal employees and different contracting crews were "to be placed," which the Court reads as Miracle telling them where they needed to go each day. (*Id.* at 14). Nowhere in Miracle's deposition does he state that his authority over Lockhart Trucking went

beyond implementing the plan for the day.  He is consistent that, for instance, any discipline for not following the plan for the day was left to the discretion of Ozsever and Farinelli.

As to the safety and environmental standards, the record is equally disputed. Miracle's deposition only reflects that it was his job to make sure the WDA "was in compliance with DEQ at all times," which Miracle explains requires him to conduct certain compaction tests and report the results to DEQ each day.  (Doc. 35-1 at 13). Miracle also testified he ran weekday safety meetings.  (*Id*. at 12).  In no part of his deposition does he describe enacting remediation, safety corrections, or other types of recourse involving safety/environmental hazards and Lockhart Trucking.  Rather, Miracle's affidavit states that Ozsever and Farinelli were responsible for "enacting remediation or safety corrections." (Doc. 38-2 at 4).

In sum, the record does not undisputedly reflect that Miracle had the kind of broad decision-making discretion over contractors that Signal purports him to have. Instead, portions of the record consistently indicate that Miracle's responsibilities with respect to the daily operations and safety standards were narrow and confined to specific projects.  These portions of the record, cast alongside Phipps's testimony to the contrary, are sufficient to create a genuine dispute as to the scope of Miracle's responsibilities with respect to the operations of contractors.

The Court extends this conclusion to Signal's assertion that Miracle is a managerial employee or an employee who occupies a "sensitive" managerial position and exercises "broad discretion." The record is disputed on this fact, and therefore the Court cannot conclude at summary judgment that Signal had the broadest discretion to terminate Miracle based on his position at Signal.

### 3. Interest's Interference—or Appearance of Interference—with Miracle's Execution of His Job Duties

The last component of a conflict of interest under Signal's policies is whether the interest of the employee in a decision made by Signal interferes with, or even appears to interfere with, the execution of their job responsibilities. Signal does not argue that any actual interference happened; rather, Signal asserts, in Phipps's words, that it "lost trust and confidence in Mr. Miracle's judgment, honesty, and ability to continue as superintendent of the WDA" as a result of his alleged conflict of interest. (Doc. 36 at 5; Doc. 37 at 12). Miracle retorts that his own supervisor did not feel the same way, yet Signal never inquired with Ozsever about Ozsever's perspective on Miracle's ethics and ability to objectively perform his job duties. (Doc. 38 at 12). Miracle notes Ozsever testified that he "never had any concerns about Miracle's ethics, loyalty, honesty, integrity, and fair dealings." (*Id.* at 13). Miracle also had received a positive performance review the day of his termination. (*Id.* at 15).

24

Taking Phipps entirely at his word, the company's loss of trust and confidence in Miracle is based entirely on the disputed facts about the actual influence and decision-making power Miracle had over Lockhart Trucking.  Since those facts are disputed, the extent that Miracle's interest in Signal's decision-making influenced his ability to execute his job must also be disputed.

### 4.  *Notification of Actual or Potential Conflict*

If the Court had concluded that an actual or potential conflict of interest existed, it would next look at whether Miracle had notified the proper parties. According to the Conflict Policy, Miracle needed to "fully disclose" the loan to the Human Resources Director.  (Doc. 41 at 4–5).   Under the Ethics Code, Miracle needed to tell his supervisor that Lockhart had requested a loan from Miracle and to disclose in writing to the Company Comptroller that he was giving Lockhart Trucking the loan before doing so.  (*Id.* at 6–7).

Putting aside the policies' inconsistency with respect to the proper notification procedure for a conflict of interest, the parties presented no evidence or argument on whether Miracle disclosed to the Human Resources Director or the Company Controller.  Thus, Signal has not met its burden to show this fact is undisputed.

Miracle contends that his supervisor, Ozsever, knew about the loan.  Signal does not dispute this but instead says disclosure to Ozsever would be insufficient regardless.

25

There is no direct testimony from Ozsever to that fact or any concerning the loan. This fact is material, since disclosure to Ozsever would satisfy one of the three requirements of the Ethics Code and Conflict Policy.   That said, disclosure to Ozsever alone would appear to violate both.

Because Miracle's compliance or lack thereof with the disclosure requirements is unclear, Signal has not met its burden to show Miracle undisputedly failed to comply with the policies and summary judgment is not proper.

     *5.  Summary*

Material disputes exist as to whether Miracle was able to make or influence decisions in which he had an interest, whether his interest in those decisions interfered with or appeared to interfere with the execution of his job duties, and whether he disclosed the loan to persons at Signal in compliance with its policies. These facts are determinative of whether Miracle violated Signal's Conflict Policy and Ethics Code and, as a result, whether Signal had good cause to terminate him. Thus, summary judgment is not proper.

Because good cause is disputed, the Court does not need to decide whether Signal's reason for discharging Miracle was pretextual.

**B.**    *Violation of Personnel Policies*

Miracle also claims wrongful discharge based on Signal's alleged violation of its written personnel policies.  Under Montana Code Annotated § 39-2-904(1)(c), a

discharge can be wrongful if "the employer materially violated an express provision of its own written personnel policy prior to the discharge, and the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer."

Miracle asserts in his Complaint that Signal violated its own policies regarding performance management when it terminated Miracle based on an unsubstantiated rumor about the loan. (Doc. 4 at 5). In its response to Signal's instant motion for summary judgment, Miracle asserts that Signal had a progressive discipline policy, which it did not follow in discharging Miracle. (Doc. 38 at 20–21). Miracle also mentions in his brief that there are genuine issues of material fact regarding Signal's investigation, or lack thereof, into the loan, but does not use it as a basis for asserting a violation of personnel policies. (*Id.* at 12–13).

Signal argues the Court should reject Miracle's claim that Signal violated a written personnel policy in discharging Miracle because Signal does not have a progressive disciplinary policy. (Doc. 37 at 21). Rather, Signal's personnel policies explicitly state that "[d]iscipline is at the discretion" of Signal "and shall be decided on a case-by-case basis." (*Id.* at 22 (citing Doc. 20-1 at 126–27)). Signal does not address Miracle's arguments concerning the investigation into the loan.

Miracle does not cite to a progressive disciplinary policy in Signal's Employee Handbook. Instead, Miracle cites to the entire Employee Handbook,

which is 73 pages long. (Doc. 38 at 20). In reviewing the Employee Handbook, the Court could not find a progressive discipline policy.

What the Court could find was a delegation of nearly unfettered discretion to Signal to determine the appropriate disciplinary action for violations of performance standards. In addition to the language quoted above, the handbook states, in part: "Signal Peak may impose disciplinary action in those instances where management decides it is appropriate. Disciplinary action includes, but is not limited to, oral warnings, written warnings, suspension, and discharge. Signal Peak retains the right to determine what discipline will be imposed in each individual situation." (Doc. 20-1 at 126–27)). As the Court reads the Employee Handbook, if Miracle violated a performance standard, the type of discipline imposed is entirely up to Signal.

Among those performance standards included in Signal's non-exhaustive list is a violation of Signal policies, rules, regulations, or practices. Accordingly, if Miracle violated Signal's conflict of interest policies, Signal had the discretion to determine that discharging Miracle was the appropriate disciplinary response. However, since Miracle's alleged violation of the conflict of interest policies is disputed, the Court can neither find that Signal had such discretion nor grant judgment in Signal's favor on the issue of whether it violated its personnel policies in discharging Miracle.

C.    *Punitive Damages*

Signal last moves for summary judgment on Miracle's punitive damages claim. (Doc. 37 at 23–27). Miracle concedes that, upon further investigation of his case, his punitive damages claim is unsubstantiated. (Doc. 38 at 21). Thus, it is undisputed that Miracle is not entitled to punitive damages, and the Court grants Signal's motion on this claim.

## IV.   Conclusion

Signal's previous summary judgment motion on Miracle's wrongful discharge claim failed because the record was almost entirely devoid of facts. Now, Signal returns to the Court with more evidence, but few undisputable facts. Instead, it asks the Court to decide who it believes more. Such weight and credibility determinations are reserved for the jury. Thus, summary judgment as to Miracle's wrongful discharge claim is improper. Summary judgment is proper on Miracle's punitive damages claim.

IT IS HEREBY ORDERED that Defendant Signal Peak Energy, LLC's Motion for Summary Judgment (Doc. 33) is DENIED as to Miracle's wrongful discharge claim and GRANTED as to Miracle's punitive damages claim.

DATED this 30th day of January, 2024.

_Susan P. Watters_
SUSAN P. WATTERS
United States District Judge